697 F.2d 421
 112 L.R.R.M. (BNA) 2374, 225 U.S.App.D.C. 179
 Donald J. DEVINE, Director, Office of Personnel Management, Petitioner,
v.
Harold C. WHITE, Arbitrator, American Federation of
Government Employees, National Border Patrol
Council, and Noe Lopez, Respondents.
 No. 81-1893.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 18, 1982.
Decided Jan. 7, 1983.
 
 Petition for Review of an Order of Harold C. White, arbitrator.
 Howard S. Scher, Atty., Dept. of Justice, Washington, D.C., with whom Stanley S. Harris, U.S. Atty., and William Kanter, Atty., Dept. of Justice, Washington, D.C., were on the brief, for petitioner.
 William Stone, Washington, D.C., for respondents. James R. Rosa and Jane P. Danowitz, Washington, D.C., were on the brief, for respondents.
 Before LUMBARD,* Senior Circuit Judge, United States Court of Appeals for the Second Circuit, HARRY T. EDWARDS and BORK, Circuit Judges.
 
 
 1
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 
 
 2
 Concurring Opinions filed by Senior Circuit Judge LUMBARD and Circuit Judge BORK.
 
 TABLE OF CONTENTS
 Page
 
 3
 I. BACKGROUND ............................... 425
 A. Introduction .......................... 425
 B. Factual Background .................... 426
 C. The Arbitral Proceedings .............. 426
 II. DISCUSSION ............................... 427
 A. Timeliness of the Petition for
 Review .......................... 429
 1. Introduction ....................... 429
 2. Reconsideration of Arbitral
 Decisions .......................... 430
 3. Conclusion ......................... 433
 B. The Propriety of Judicial Review ...... 433
 1. Introduction ....................... 433
 2. Desirability of Limited Judicial
 Review ............................. 435
 3. Application to this Case ........... 440
 C. The "Harmful Error" Standard .......... 441
 1. Applicability of the Standard
 in Arbitral Proceedings ............ 441
 2. The Meaning of "Harmful
 Error" ............................. 442
III. CONCLUSION ............................... 443
APPENDIX A
APPENDIX B
 
 HARRY T. EDWARDS, Circuit Judge:
 
 4
 This appeal involves a review of an arbitrator's decision in an "adverse action" case arising under the Civil Service Reform Act of 1978 ("CSRA" or "Act").[1] The case poses several highly significant issues focused on the propriety of judicial review of arbitrators' decisions in the federal sector. In particular, and for the first time, this court clearly faces questions concerning the circumstances under which the Director of the Office of Personnel Management ("OPM") may seek judicial review of an arbitrator's decision; whether the Director must or may first request "reconsideration" of an arbitrator's award before seeking judicial review; the time limits on petitions for judicial review of an arbitrator's award; the application of the "harmful error" standard in adverse action cases; the reviewability of an arbitrator's decision; and the amount of deference that is due arbitral decisions involving adverse actions under the CSRA.
 
 
 5
 To address these questions, we have been required to wade through the statutory maze of the CSRA. In undertaking this task, we have come to realize that the Act is fraught with ambiguities, peppered with provisions that appear at cross purposes, and often lacking any useful legislative history. Despite these hazards, we endeavor here to enforce strictly the literal terms of those provisions of the Act that are unambiguous and internally consistent, and to remain faithful to the central congressional purposes underlying the enactment of the CSRA. Where the terms of the statute are ambiguous and we can find no guidance in the legislative history, we look to the common law of labor arbitration to devine statutory meaning.
 
 I. BACKGROUND
 A. Introduction
 
 6
 Exercising the authority conferred on him by the CSRA, the Director of the OPM seeks review of an arbitrator's decision--issued pursuant to a collectively bargained grievance procedure--setting aside a disciplinary sanction imposed by the Immigration and Naturalization Service ("INS" or "Service") on one of its agents. Mindful of the considerable threats to the congressionally mandated system of grievance arbitration posed by such petitions for review, we approach with caution the issues raised herein, several of which have never been considered in the courts of appeals. The need to resolve these unsettled interpretative questions tips the balance in favor of reviewing the arbitrator's decision,[2] and we ultimately decide that it cannot stand. For the reasons set forth below, however, we deem inappropriate a simple reinstatement of the INS's suspension, and we remand the case to the arbitrator for clarification of his decision in accordance with the principles enunciated in this opinion.B. Factual Background
 
 
 7
 The facts relevant to the disposition of this petition for review are uncontroverted. On May 9, 1980, INS agent Noe Lopez, on temporary assignment in Florida to assist in handling the unusual influx of Cuban refugees, was involved in an automobile accident while driving a government vehicle after work under such circumstances that it could "only be concluded that the vehicle was used without authorization and used for purposes other than official business"[3] in violation of federal law and agency regulations.[4] No citations were issued or charges filed, but Lopez was returned to his permanent duty station in Texas on May 13, 1980. On May 20, eleven days after the accident, an internal INS memorandum reviewing the details of the accident was prepared and sent to the Chief Patrol Agent in Miami, but the matter lay dormant until June 26, when the driver of the vehicle that Lopez hit threatened to sue the INS and informed the Service that he had reported the incident to his Senator.
 
 
 8
 The day after he received the irate citizen's letter, the Chief Patrol Agent in Miami forwarded the Service's investigative report to the Regional Commissioner in Dallas for consideration of possible violations by Lopez. Almost four months later, on October 20, the INS informed Lopez of its intention to suspend him for thirty days without pay for misusing a government vehicle. Lopez responded to this notice on October 29, agreeing with the charges and requesting leniency. The agency's final decision--imposing a thirty-day suspension without pay "to promote the efficiency of the service"[5]--was rendered on November 10, and Lopez was informed of his right to appeal to the Merit Systems Protection Board ("MSPB") or to request his union to pursue a grievance through the arbitration mechanism established by its collective bargaining agreement.[6] He chose the latter alternative.
 
 C. The Arbitral Proceedings
 
 9
 The grievance protesting Lopez' thirty-day suspension was brought before arbitrator Harold C. White. Although arbitrator White found that Lopez had violated federal law and the INS's rules and that a one-month suspension was the minimum penalty required by statute,[7] the decision that he issued on May 13, 1981 ordered the Service to reverse the suspension because it had neither conducted its investigation nor administered discipline in a timely manner as required by Article 31F(3) of the collective bargaining agreement between the INS and the American Federation of Government Employees ("Union").[8] In reaching this conclusion, arbitrator White first observed that Lopez had been unaware of the INS's investigation until October 20, 1980, over five months after his accident. The arbitrator then rejected the Service's explanation--based on the administrative and operational burdens imposed by the influx of Cuban refugees and the Iranian student crisis--for the delay in processing Lopez' case.
 
 
 10
 On June 11, 1981, twenty-nine days after the arbitrator rendered his decision, the OPM, which had not participated in the arbitral hearing, requested reconsideration on the ground that the decision was "clearly erroneous and [would] have a substantial impact on civil service law."[9] The OPM found statutory authority for its intervention in 5 U.S.C. Sec. 7703(d) (Supp. V 1981),[10] and advanced two contentions that the INS had not raised in arbitration. It argued first, untenably, that arbitrator White's decision improperly allowed the negotiated agreement to override the statutorily mandated penalty for misuse of a government vehicle.[11] Second, and more plausibly, the OPM argued that an agency disciplinary decision supported by the preponderance of the evidence[12] could be reversed on procedural grounds only if the employee demonstrated that the procedural defect constituted "harmful error."[13]
 
 
 11
 The OPM's petition for reconsideration was opposed by the Union,[14] and was rejected by arbitrator White on July 8, 1981, on the grounds that (1) it contained materials not presented in the hearing and (2) he had no authority to reconsider because "the submission of the arbitrator's decision ends the arbitrator's involvement in the arbitration process."[15] The OPM apparently did not receive notice of this decision until July 17; on August 7, twenty-one days after the OPM learned that its petition for reconsideration had been denied and almost three months after the arbitrator's reversal of the INS's disciplinary action, the Director of the OPM petitioned for review by this court.
 
 II. DISCUSSION
 
 12
 Continuing the trend toward the provision of meaningful bargaining rights for public employees,[16] Congress included in the CSRA its first codification of arbitration as a dispute resolution mechanism for federal employees.[17] Under the terms of the Act, every collective bargaining agreement must contain a "fair and simple" grievance procedure that "provide[s] for expeditious processing" and allows both the union and the employer to invoke "binding arbitration" in the event of a failure to reach a satisfactory settlement. 5 U.S.C. Sec. 7121(a)-(b) (Supp. V 1981).[18] These negotiated grievance procedures can be applied to four different types of disputes, each of which "entails its own uniquely complex processing machinery."[19]
 
 
 13
 In adverse action cases such as this one, the CSRA affords the aggrieved employee a choice of procedures; he must initially and irrevocably decide either to pursue his claim through the negotiated grievance mechanism included in the collective bargaining agreement between his union and his employer or to utilize the statutorily established appellate procedures of the MSPB. 5 U.S.C. Sec. 7121(e)(1) (Supp. V 1981).[20] To promote consistency and to discourage forum shopping,[21] Congress has provided that an employee's choice of procedural routes cannot affect the applicable standard of review: Section 7121(e)(2) requires arbitrators to apply the same statutorily established evidentiary standards that govern the MSPB's review of agency actions.[22] For a similar reason,[23] arbitral decisions are subject to judicial review "in the same manner and under the same conditions as if the matter had been decided by the [MSPB]." 5 U.S.C. Sec. 7121(f) (Supp. V 1981).[24]
 
 
 14
 Although section 7121 provides substantial guidance to arbitrators and courts reviewing arbitral decisions, a number of important questions concerning both the procedures governing appeals to the MSPB and judicial review of MSPB decisions and the applicability of those procedures to cases brought under negotiated grievance mechanisms remain unresolved. One of the most important of these questions--whether arbitrators are required to apply the MSPB's "harmful error" standard[25] when reviewing agencies' procedural defaults--is squarely presented by the OPM's petition for review. Before reaching this issue, however, we must decide whether the OPM's petition was timely filed and whether the discretionary assertion of this court's jurisdiction is appropriate in this case.
 
 A. Timeliness of the Petition for Review
 1. Introduction
 
 15
 By its reference to section 7703, section 7121(f) authorizes the Director of the OPM to seek judicial review of an arbitrator's decision in any matter covered under sections 4303 and 7512 by filing a petition for review with this court.[26] "Notwithstanding any other provision of law," section 7703(b)(1) declares, such petitions "must be filed within 30 days after the date the petitioner received notice of the final order or decision" of the arbitrator. This requirement is jurisdictional, Miller v. United States Postal Service, 685 F.2d 148, 149 (5th Cir.1982); Parton v. MSPB, 684 F.2d 530, 533 (8th Cir.1982) (per curiam); Boehm v. Foster, 670 F.2d 111, 113 (9th Cir.1982) (per curiam), and the statutorily specified filing period is not subject to enlargement, Brown v. National Highway Traffic Safety Administration, 673 F.2d 544, 545 (D.C.Cir.1982) (per curiam); see FED.R.APP.P. 26(b). Because the OPM did not seek judicial review until nearly three months after arbitrator White's decision, the respondent argues, its petition must be rejected as untimely.
 
 
 16
 Although the command of section 7703(b)(1) is unequivocal, one could argue that, by virtue of its placement within the overall scheme established by section 7703, the filing requirement applies only to petitions filed by adversely affected employees. Subsections (a) and (b) establish procedures for appeals by aggrieved employees, and subsection (c) sets forth the standard of review; only in subsection (d) did Congress authorize appeals by the Director of the OPM, and subsection (d) contains no time limits.[27] A similar parsing of the section led the Eighth Circuit to conclude that there exists "no authority to support the application of the section 7703(b) time limits to section 7703(d)." Parton v. MSPB, 684 F.2d at 533 (dicta). We disagree.
 
 
 17
 We note first that the Senate Report on the CSRA stated that "[t]he Director, like any other petitioner, is required to seek review within 30 days of the decision of the [MSPB]."[28] In context, however, this statement does not resolve the matter, for the Committee, in the course of describing the circumstances under which the Director could seek judicial review, of necessity discussed the requirement that the Director seek reconsideration by the MSPB before requesting judicial review.[29] As a result, we cannot determine with certainty whether the Committee's reference to the thirty-day limit pertained to the timing of a petition for judicial review or a petition for reconsideration by the MSPB.[30] Our conclusion that a petition for judicial review filed by the Director of the OPM more than thirty days after he received notice of a final order or decision of the MSPB or an arbitrator is untimely rests, therefore, not on the legislative history of the Act, but on two other compelling reasons.
 
 
 18
 First, the applicability of the thirty-day limit in section 7703(b)(1) is not, by its terms, restricted to appeals brought by aggrieved employees; on the contrary, the section purports to govern "any petition for review." We can discern no basis in either logic or public policy for limiting the section's broad scope by distinguishing between the treatment of petitions filed by the OPM and those filed by aggrieved employees. Second, the Eighth Circuit's reading of section 7703(d) imposes no limits on the time in which the OPM may petition for review. Although the Director could eventually become subject to the defense of laches,[31] expanding the time period within which he could seek judicial review is flatly inconsistent with the congressional purposes underlying the CSRA. Congress was, after all, motivated in large part by a desire to reduce substantially both the amount of time consumed by the appellate process[32] and the courts' role in reviewing federal agencies' decisions to discipline and dismiss their employees;[33] these goals would be ill-served by a potentially limitless expansion of the length of the appellate process. Recognizing, as did Congress,[34] the need for finality in MSPB and arbitral decision making,[35] we hold, therefore, that the Director of the OPM loses his right to appeal final orders or decisions of the MSPB and arbitrators unless he files a petition for review within thirty days of the time he is put on notice of those decisions.
 
 2. Reconsideration of Arbitral Decisions
 
 19
 Given our conclusion on time limits, the problem posed by OPM petitions for review of arbitrators' decisions becomes clear. Section 7703(d), arguably, may be read to require the OPM to seek reconsideration by the arbitrator before requesting judicial review, but it seems unlikely that Congress intended the Director to seek reconsideration and to petition for judicial review within thirty days.[36] In cases where the affected employee brought his claim before the MSPB, the CSRA expressly authorizes petitions for reconsideration by the OPM;[37] section 7701(e)(1) provides, moreover, that a timely petition for reconsideration prevents a decision of the MSPB from becoming "final" and thus tolls the running of section 7703's time limits. But section 7121(f), which authorizes judicial review of arbitrators' decisions, neither incorporates section 7701(e)(1) nor makes any provision for OPM participation in the arbitral decision-making process.
 
 
 20
 We must decide, therefore, whether the OPM is required or permitted to seek reconsideration of arbitrators' decisions before requesting judicial review and whether the delay inherent in any sort of reconsideration process excuses a failure to file a timely petition for judicial review. We suggested a tentative answer to these questions in Devine v. Goodstein, 669 F.2d 736 (D.C.Cir.1981) (per curiam), when we noted that "[b]ecause the Director did not intervene in the matter when it was before the arbitrator, he petitioned the arbitrator for reconsideration as required by section 7703(d)." Id. at 736. The OPM relies heavily on this observation, but the issue was not presented and argued to the Goodstein court, and we do not feel bound to adhere to its dictum.
 
 
 21
 Our answers to these critical questions concerning the reviewability of arbitrators' decisions should turn, to the extent possible, on the language of section 7703(d).[38] As noted above, this provision, by inference, may be read to require the OPM to seek reconsideration before requesting judicial review. But, when considered in context,[39] section 7703(d) is at best equivocal, for Congress made no provision in the CSRA for OPM participation in arbitral decision making, nor did it authorize petitions for reconsideration of arbitrators' awards. An interpretation of section 7703(d) that ignores these omissions would produce an irrational or absurd result[40] and one contrary to Congress' intent.[41] Our review of the CSRA and the common law of arbitration[42] reveals three compelling justifications for a conclusion that section 7703(d) does not require the OPM to request arbitrators to reconsider their decisions before seeking judicial review.
 
 
 22
 First, petitions for reconsideration of arbitrators' decisions are inconsistent with the overall statutory scheme established by the CSRA. In the case of appeals by aggrieved employees to the MSPB, the role of the OPM is well defined. If "the interpretation or application of any civil service law, rule, or regulation, under the jurisdiction of the [OPM] is at issue" and the Director believes "that an erroneous decision would have a substantial impact" on any law, rule, or regulation under the OPM's jurisdiction, "the Director may as a matter of right intervene or otherwise participate in that proceeding before the [MSPB]."[43] If the Director does not exercise this right of intervention, the CSRA requires that he employ an alternative procedure--the petition for reconsideration--before seeking judicial review.[44] We infer from Congress' command that the OPM intervene in MSPB decisions "as early ... as practicable,"[45] and its desire to reduce the time required to complete the appellate process,[46] that Congress viewed a petition for reconsideration as a second-best substitute for direct participation in MSPB hearings. Because Congress easily could have, but did not, authorize the OPM to intervene in arbitral proceedings, we believe that it would be inappropriate to require or allow the OPM to seek reconsideration of arbitrators' decisions, particularly in light of the severe negative impact of such petitions on the arbitral process.[47]
 
 
 23
 Second, we believe that had Congress considered the matter it would have found that its assessment of the costs and benefits of OPM participation--either by intervention or petition for reconsideration--in the MSPB decision-making process does not hold true in the case of arbitration. Even if it had ignored the effect of OPM participation on the speed and simplicity of negotiated dispute resolution mechanisms, Congress no doubt would have recognized that third party intervention is inimical to the very nature of the arbitral process. Although the participation of various interested persons and agencies in the administrative process is routine, imposing that aspect of the administrative model on arbitration would undermine several of the latter system's fundamental characteristics. Most obviously, OPM intervention is inconsistent with the informality that has traditionally typified arbitral proceedings.[48] Unless authorized by the parties, moreover, such intervention would disrupt arbitration's role as a bargained-for "part of a system of self-government created by and confined to the parties,"[49] and threaten to reduce both its therapeutic value[50] and its ability to resolve disputes in a manner that preserves the ongoing relationships of the involved parties.[51] These consequences, we believe, could not have been intended by Congress and, absent specific congressional authorization, we will not recognize a right of the OPM to participate in the arbitral process by either direct intervention or petition for reconsideration.
 
 
 24
 Third, nothing in the legislative history of the CSRA suggests that Congress intended to alter the common law concerning arbitrators' authority to reconsider their decisions.[52] "The cases are unanimous in supporting [the] principle" that "[w]hen the final award has been rendered ... all power of the arbitrators is exhausted, and any further action that they take will be utterly void unless the parties confer new authority upon them."[53] And since a request for reconsideration by only one of the parties has no effect, see CODE OF PROFESSIONAL RESPONSIBILITY FOR ARBITRATORS OF LABOR-MANAGEMENT DISPUTES, Rule 6(D),[54] a request by a nonparty such as the OPM would be a useless act, particularly when, as here, the request is opposed by one of the parties to the collective bargaining agreement.[55] Arbitrators' traditional unwillingness and inability to countenance petitions for reconsideration, moreover, are based on sound policy factors, for reconsideration "would often cause great inconvenience and added expense, and ... would defeat one of the chief purposes of arbitration, which is to provide for speedy settlement of disputes."[56] It would thus be unreasonable to infer that Congress intended either to authorize arbitrators to reconsider their decisions or to delay the appellate process to accommodate the filing of meaningless petitions for reconsideration by the OPM.
 
 3. Conclusion
 
 25
 For the foregoing reasons, we conclude that the OPM is neither required nor permitted to seek reconsideration of arbitrators' decisions before requesting judicial review. Such petitions are inconsistent with the structure of the CSRA and with fundamental characteristics of the arbitral process. Therefore, the filing of a petition for reconsideration will not hereafter justify a failure by the OPM to comply with the thirty-day deadline imposed by section 7703. In this case, however, the OPM filed its petition for reconsideration by the arbitrator within thirty days of his decision, and appealed from the arbitrator's denial of that petition within thirty days of the time it received notice of that denial. Because the OPM's conduct was guided by the misleading signals given by this court in Devine v. Goodstein, 669 F.2d 736 (D.C.Cir.1981) (per curiam), we believe that it would be improper to apply this rule retroactively, and we excuse the OPM's failure to seek judicial review in a timely manner.
 
 B. The Propriety of Judicial Review
 1. Introduction
 
 26
 The Director of the OPM seeks review of arbitrator White's decision under section 7703(d), which is made applicable to arbitral decisions by section 7121(f). Section 7703(d), however, does not give the Director a right to appeal in every case; he may petition for judicial review only after determining that the arbitrator "erred in interpreting a civil service law, rule, or regulation affecting personnel management and that the ... decision will have a substantial impact on a civil service law, rule, regulation, or policy directive."[57] As the legislative history makes clear, Congress intended to avoid unnecessary appeals by requiring the Director to undertake a meaningful and searching evaluation before requesting judicial review. Thus, "[t]he Director ... should not seek judicial review if the potential effect of the decision will be limited to the facts of the case," but rather should limit his requests to "those exceptional cases" where the arbitrator erred, "as a matter of law, in interpreting the civil service laws, and ... the erroneous decision will have a substantial impact on how aspects of the civil service rules are interpreted in the future."[58]
 
 
 27
 Although the OPM must initially make this determination, its conclusion is not binding on the court. We are, of course, cognizant of the general judicial practice of "defer[ring] to the agency's understanding of the statute which it administers,"[59] and we believe that this practice constitutes a sound approach to statutory construction under many circumstances. Its application here, however, would frustrate the policies animating section 7703(d). To ensure that the OPM would exercise restraint in pursuing judicial relief and confine its requests to truly "exceptional cases," Congress provided in section 7703(d) that "[t]he granting of the petition for judicial review shall be at the discretion of the Court of Appeals," and made clear in the Senate Report that the court was independently to evaluate the impact of the challenged decision on the administration of the civil service law.[60]
 
 
 28
 In the one previous case that has presented this issue, Devine v. Goodstein, 680 F.2d 243 (D.C.Cir.1982) (per curiam), we agreed with the OPM that an arbitrator's clearly erroneous application of self-incrimination, double jeopardy, and equal protection principles would have had a substantial impact on civil service law. But the CSRA contemplates that this determination will be made on a case-by-case basis, and the Goodstein court's opinion provides little guidance concerning the factors that should influence a court's decision. In assessing whether the OPM has made a sufficient showing to justify a review of arbitrator White's decision, we believe it appropriate to balance the need for review against the traditional policy of deference to arbitrators' decisions. Congress clearly intended to protect federal employees' due process rights,[61] and thus conferred on ag grieved employees an absolute right to seek judicial review.[62] When assessing the need for appeals by the Government, however, Congress was unhampered by such concerns.[63] Consequently, we feel constrained to apply Congress' strict review criteria in such a way as to protect the arbitral process.
 
 2. Desirability of Limited Judicial Review
 
 29
 At this late date, "the federal policy favoring arbitration of labor disputes,"[64] enunciated by the Supreme Court in Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957), and the Steelworkers Trilogy,[65] is so well established as to need little defense. It has long been recognized that arbitration of such disputes is faster, cheaper, less formal, more responsive to industrial needs, and more conducive to the preservation of ongoing employment relations than is litigation;[66] that arbitration is perceived to produce results that are qualitatively superior to the results achieved through litigation in comparable personnel and labor relations matters;[67] and that the overwhelming majority of union and management officials prefer arbitration over resort to the courts.[68] Although some of these advantages have been called into question as the costs and delays associated with arbitration have mounted in recent years,[69] no one seriously doubts that in-court litigation time in comparable cases is much longer than the time required to arbitrate a dispute, and no evidence need be cited to make the point that full-blown litigation, including discovery and appeals, is significantly more expensive than arbitration.[70] "[E]ven when it functions at its best," there is good reason to believe that litigation is less desirable than arbitration as a means of resolving most of the typical disputes arising out of the employer-employee relationship.[71]
 
 
 30
 The advantages of arbitration over litigation in personnel cases are attributable less to the characteristics of labor arbitrators than to the characteristics of the arbitration process. A principal characteristic of the common law of labor arbitration in the United States is judicial deference to arbitral decisions. Although some measure of judicial review of arbitrators' decisions is necessary and desirable,[72]
 
 
 31
 [i]n order to facilitate national labor goals, the arbitration result must be final and binding. Disputes should be conclusively resolved privately. Protracted litigation acts as an irritant in the industrial relationship and runs counter to the parties' own voluntary commitment to have an arbitrator, and not a court, decide the substance of the dispute. Plenary review of merit determinations would destroy finality.[73]
 
 
 32
 The impact of such a loss of finality on the speed and expense of arbitration[74] needs no further elucidation, but a more subtle consequence of extensive judicial review may change the nature of the arbitral process to an even greater extent.
 
 
 33
 If arbitration becomes simply another level of decision making, subject to judicial review on the merits, arbitrators may begin to decide cases and write opinions in such a way as to insulate their awards against judicial reversal[75]--producing opinions that parrot the appropriate statutory standards in conclusory terms, but suffer from a lack of reasoned analysis. Such a shift from the arbitral model, in which decision makers are free to focus solely on the case before them rather than on the case as it might appear to an appellate court, to the administrative model, in which decision makers are often concerned primarily with building a record for review, would substantially undercut the ability of arbitrators successfully to resolve disputes arising out of the employment relationship.
 
 
 34
 As a result, arbitrators' awards in the private sector are generally regarded as binding on the parties to the dispute, and judicial review is extremely limited. United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), in which the Supreme Court embraced the common law tradition of deference to arbitral determinations,[76] constitutes the most influential statement of this position.[77] Although it cautioned that arbitrators are not authorized simply to dispense their "own brand of industrial justice," id. at 597, 80 S.Ct. at 1361, the Enterprise Wheel Court asserted unequivocally that any award that "draws its essence from the collective bargaining agreement," id., is entitled to judicial acceptance. Courts should vacate an arbitrator's award only when "the arbitrator's words manifest an infidelity to this obligation." Id.[78] Although Enterprise Wheel occasionally has been given questionable readings by the courts,[79] deference continues to be the most distinguishing characteristic of judicial review of arbitral decisions rendered under private sector collective bargaining agreements.[80]
 
 
 35
 The private sector's tradition of deference, however, has not yet been fully incorporated into the federal system.[81] Although Congress intended that arbitration in the federal sector reflect the private sector model in many important aspects,[82] several differences remain that arguably justify less deference to arbitration under the CSRA. First, the so-called management rights of federal employers may deserve greater protection than the management rights of private employers because of a variety of constitutional, political, and economic reasons.[83] But this argument, at its core, is addressed to the propriety and scope of collective bargaining itself more than to the amount of deference due arbitral decisions, and Congress has already made the determination that the advantages of collective bargaining in the federal sector outweigh its disadvantages.[84] Management rights, moreover, are adequately protected by other sections of the CSRA;[85] limiting the deference due arbitrators' decisions is not necessary to ensure that these rights are respected. Finally, Congress' failure to accord affected agencies a right to appeal and the extremely limited right of appeal afforded the OPM suggest that Congress did not consider in-depth review of arbitrators' decisions essential to the protection of management rights.
 
 
 36
 Second, to the extent that arbitration deserves deference because of its role as part of a system of industrial self-government,[86] closer scrutiny might be justified in the federal sector because grievance procedures arestatutorily mandated, whereas in the private sector grievance procedures are strictly the product of the parties' negotiations.[87] But this difference seems inconsequential, for both the precise nature of grievance procedures and the matters to which they apply are generally left to the parties' discretion in the federal sector.[88] Furthermore, the parties to the collective bargaining agreement control the selection of the arbitrator who will resolve their particular dispute. As in the private sector, therefore, "[c]ourts should be most reluctant to override the earlier commitment of both parties to select [a] particular arbitrator as the articulator of their contractual obligations in order to ... relieve one party from the unwelcome result of that purposeful choice."[89] And, like their private sector counterparts, federal agency employers and employees can return "an occasional aberrant arbitral decision ... to the same process of negotiation by which the parties created the arbitrator's authority in the first place."[90] In these important senses, arbitration is as much a part of the system of self-government in the federal service as in the private sector.[91]
 
 
 37
 Third, the standard of review should arguably be broadened to take account of the nontraditional roles performed by arbitrators in the federal sector. The role of "external law"--laws, rules, and regulations not specifically incorporated in the collective bargaining agreement--in private sector arbitration has been hotly debated,[92] but is clearly limited.[93] In the federal sector, however, arbitration is intended not only to ensure compliance with collective bargaining agreements, but also "to review or police compliance with controlling laws, rules, and regulations by federal agency employers and employees alike."[94] When a grievance implicates the second of these roles, it is not clear that all of the assumptions underlying Enterprise Wheel's "essence" test--particularly the notion that arbitrators are better versed in the "law of the shop" and better able to construe collective bargaining agreements than are judges--continue to justify deference to the arbitrator's decision.[95]
 
 
 38
 This argument, of course, provides no support for expanded judicial review when an arbitrator has performed the more traditional role of contract interpretation. We are not persuaded, moreover, that the rules at issue in most CSRA adverse action cases, although created by statute or agency regulations as well as by collective bargaining agreements, are outside the competence or usual range of expertise and experience of labor arbitrators. The nature of a management rights clause is not altered by the fact that it is codified in a statute rather than defined in a collective bargaining agreement, and procedural requirements are procedural requirements, notwithstanding their source. In short, the typical adverse action case presents issues identical to those with which labor arbitrators deal on an everyday basis.[96] If the parties have not removed procedures and rules defined by statutes or agency regulations from the scope of the negotiated grievance mechanism,[97] an arbitrator's interpretation of that statute or regulation should be binding on them.[98]
 
 
 39
 We thus conclude that the possible grounds for treating arbitral decisions in the federal sector less deferentially than private sector decisions cannot withstand careful scrutiny. This does not mean, however, that Congress did not evaluate the relevant considerations differently and intend that courts reviewing arbitrators' decisions in federal adverse action cases accord those decisions less deference than awards rendered under private collective bargaining agreements. Congress did, after all, provide that almost all "pure grievance"[99] cases could be appealed only to the Federal Labor Relations Authority[100] and only if the decision is "contrary to any law, rule, or regulation" or otherwise deficient on "grounds similar to those applied by Federal courts in private sector labor-management relations."[101] Because Congress framed the standard of review for adverse action cases in different terms, one could argue that it intended to subject arbitral decisions in such cases to more careful scrutiny.
 
 
 40
 Appeals by aggrieved employees from decisions of arbitrators or the MSPB in adverse action cases are governed by section 7703(c), which requires the court to set aside any actions, findings, or conclusions found to be
 
 
 41
 (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 42
 (2) obtained without procedures required by law, rule, or regulation having been followed; or
 
 
 43
 (3) unsupported by substantial evidence.[102]
 
 
 44
 That Congress would use this language, lifted almost verbatim from the Administrative Procedure Act,[103] when designing a standard of review for MSPB decisions is not surprising. In applying this standard to arbitral decisions, Congress has, it seems clear, departed somewhat from the private sector tradition of deference[104] in order to promote some uniformity of process and to ensure that the statutory procedures adequately protect the rights of government employees.[105] But, consistent with private sector precedent, it has done so in a manner that leaves arbitrators' interpretations of collective bargaining agreements themselves largely unreviewable.
 
 
 45
 The limited nature of this departure becomes clear when we examine the standards governing appeals by the OPM, which can be implied from the grounds on which that entity may seek judicial review of decisions of the MSPB or arbitrators. It would make nonsense of Congress' statutory scheme to allow a court considering such an appeal to consider either the sufficiency of the evidence or the arbitrator's interpretation of the collective bargaining agreement. Only if the court determines that the arbitrator erred as a matter of law in interpreting a civil service law, rule, or regulation[106] can it upset his decision--a standard of review that is at least as deferential as the standard governing review of arbitral decisions in the private sector.
 
 
 46
 We conclude, therefore, that (1) the policies favoring extremely limited judicial review of arbitrators' decisions are fully applicable in the federal sector; (2) Congress recognized the advantages of arbitration,[107] but effected a limited departure from the private sector's tradition of deference to ensure that arbitrators' decisions, like the decisions of the MSPB, adequately protect federal employees' rights; and (3) courts should promote arbitral resolution of disputes arising out of federal employment by considering OPM petitions for review only when the demonstrated need for review outweighs the damage to arbitration inherent in the appellate process.
 
 3. Application to this Case
 
 47
 When these principles are applied to the petition for review in this case, we believe that the balance tips in favor of exercising jurisdiction. We agree with respondent Lopez that arbitral decisions, such as the one at issue here, may only have limited precedential value;[108] we also are sympathetic to his claim that the case involves only "an arbitrator's interpretation of facts relating to the discipline of one employee under the grievance procedure of a single collective bargaining agreement."[109] But the first argument proves too much, for it suggests that arbitrators' decisions could never have a substantial impact on the civil service law, and the second is based on a mischaracterization of the OPM's petition for review.
 
 
 48
 Arbitrator White's error, if any, arose not from his factual findings or his interpretation of the collective bargaining agreement, but from his failure to apply the "harmful error" standard of section 7701(c)(2). The applicability of that standard to arbitration is an important question of first impression, the incorrect resolution of which could substantially affect the civil service law by inducing employees to appeal sanctions to arbitrators in the hope of gaining reversals and modifications more easily. Because arbitrator White made no finding, either explicitly or implicitly, that the INS's failure to administer discipline in accordance with the provisions of the collective bargaining agreement amounted to "harmful error," this issue is squarely presented here, and the need to resolve it outweighs the admitted adverse effects of judicial review on the arbitral process.
 
 C. The "Harmful Error" Standard
 
 49
 1. Applicability of the Standard in Arbitral Proceedings
 
 
 50
 Under the standard of review established by Congress for adverse action cases, the MSPB must sustain an agency decision "supported by a preponderance of the evidence," 5 U.S.C. Sec. 7701(c)(1)(B) (Supp. V 1981), unless the employee shows, among other things,[110] "harmful error in the application of the agency's procedures in arriving at such decision," 5 U.S.C. Sec. 7701(c)(2)(A) (Supp. V 1981). If an adverse action case comes before an arbitrator, section 7121(e)(2) makes clear that he too is "governed by section 7701(c)(1)['s]" burden of proof requirements.[111] But section 7121(e)(2) explicitly incorporates only section 7701(c)(1), and it is thus possible to argue that arbitrators need not find "harmful error" before reversing agency decisions on procedural grounds.
 
 
 51
 This reading of the provisions is plausible, but we reject it for two reasons. First, although section 7121(e)(2) refers only to section 7701(c)(1), the latter section is, by its own terms, "subject to" section 7701(c)(2). We believe, therefore, that the "harmful error" standard is incorporated by section 7121(e)(2). Second, allowing arbitrators to reverse agency decisions on procedural grounds without finding "harmful error" would frustrate Congress' intention "to promote consistency ... and to avoid forum shopping." H.R.REP. NO. 1717, supra note 21, at 157, 1978 U.S.CODE CONG. & AD.NEWS at 2891. We hold, therefore, that if an employee exercises his option to challenge an adverse action through a negotiated grievance procedure, the arbitrator must apply the same substantive statutory standards--including the "harmful error" rule--in deciding the case as an administrative law judge or appeals officer would be required to apply if the case had been pursued through the statutory appellate procedures.[112]
 
 
 52
 Arbitrator White did not even purport to apply those standards, and his decision cannot stand. We believe, however, that it would be inappropriate simply to reinstate the INS's decision without giving the arbitrator an opportunity to determine whether the violation of the collective bargaining agreement's timely discipline provision constituted "harmful error."[113] Nothing in the record indicates that the INS asked arbitrator White to apply the "harmful error" standard, and no previous case has held that standard applicable in arbitral proceedings. Under these circumstances, a remand would do justice between the parties without unduly burdening the arbitral process. To minimize that burden, we take this opportunity to offer some guidance concerning the definition of "harmful error"--a phrase whose meaning is hotly disputed by the parties and the interpretation of which poses particular difficulties in the context of procedures established by collective bargaining agreements.
 
 
 53
 2. The Meaning of "Harmful Error"
 
 
 54
 Although the CSRA does not define "harmful error," its legislative history makes clear that the reversal of an agency's decision for procedural error is appropriate only if the procedures followed "substantially prejudiced" the employee's rights. S.REP. NO. 969, supra note 12, at 51, 1978 U.S.CODE CONG. & AD.NEWS at 2773.[114] In many cases, it will be obvious that the agency's procedural error did do so, but the examples of harmless error that prompted Congress to impose the standard were so frivolous as to provide little guidance in closer cases.[115]
 
 
 55
 One interpretation of "harmful error," based largely on Congress' desire to reduce the number of reversals of adverse actions,[116] has been promulgated by the MSPB. Under the Board's view, employees can be substantially prejudiced only by errors that, if absent or cured, "might have caused the agency to reach a conclusion different than the one reached." 5 C.F.R. Sec. 1201.56(c)(3) (1982). "Unless it is likely that an alleged error affected the result," the MSPB believes, "its occurrence cannot have been prejudicial." Parker v. Defense Logistics Agency, 1 M.S.P.B. 489, 493 (1980). The burden of proving the affirmative defense of harmful error rests with the employee, see Tate v. U.S. Department of the Interior, 4 M.S.P.B. 192, 192 (1980); Parker, 1 M.S.P.B. at 492, and the Board has consistently held that
 
 
 56
 the question is whether it was within the range of appreciable probability that the error had a harmful effect upon the outcome before the agency. However stated, the decisive factors are the closeness of the agency's decision, the centrality of the issue affected by the error, and any steps taken to mitigate the effect of the error.
 
 
 57
 Id. at 493; see Davies v. Department of the Navy, 4 M.S.P.B. 83, 85 (1980); Fuiava v. Department of Justice, 3 M.S.P.B. 217, 218 (1980).
 
 
 58
 This interpretation of the CSRA's "harmful error" standard is consistent with a line of cases in this circuit,[117] but it is not the only possible reading of the standard.[118] We agree with the MSPB that "the mere theoretical possibility of prejudice cannot suffice as a basis for inferring actual prejudice." Parker, 1 M.S.P.B. at 493. As a result, we would not hold that delay in administering discipline, by itself, constitutes "harmful error" except under unusual circumstances.[119] But where the parties to a collective bargaining agreement negotiate concerning the timing of disciplinary actions or other matters and impose specific procedural requirements in their agreement, it may be possible to find "harmful error" even absent evidence that the violation led to a loss of evidence or other measurable adverse effects. We believe, in other words, that a violation of a clear provision of a collective bargaining agreement could constitute "harmful error" under the theory that some bargained-for procedural rights are, by definition, substantial rights of an employee.
 
 
 59
 In reaching this conclusion, we begin with a brief look at the nature of a collective bargaining agreement, which is both a contract between the parties and "a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1350, 4 L.Ed.2d 1409 (1960). Like any contract, a collective bargaining agreement may include boilerplate provisions that do not create substantial rights for either labor or management. But the inclusion of a valuable procedural safeguard, such as a requirement that discipline be administered in a timely manner, can constitute persuasive evidence that the employees attached considerable importance to it. As do courts considering the amount of compensation necessary to give a party the benefit of his breached contract, we should give effect to the parties' assessment of the substantiality of a bargained-for procedural right.[120]
 
 
 60
 This is particularly true in the federal sector, where employees are limited to bargaining over procedural matters that do not prevent an agency from exercising its reserved management rights.[121] Within the areas in which bargaining is permissible, we believe, as did Congress, that government managers are competent to look out for the government's interests. See Department of Defense, Army-Air Force Exchange Service v. FLRA, 659 F.2d 1140, 1157 (D.C.Cir.1981), cert. denied, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). Eroding the safeguards that these managers concede to employees in the collective bargaining process by applying the MSPB's monolithic "harmful error" standard would thus be inconsistent with Congress' desire to ensure that the federal government, as well as the private sector, received the benefits that flow from collective bargaining.[122] Unless a collective bargaining agreement expressly provides that violations of its procedural provisions require reversal only if the error could have affected the decision, therefore, arbitrators are free to interpret those provisions as creating substantial rights of employees, the violation of which requires reversal of a decision even absent a showing that "the error had a harmful effect upon the outcome before the agency." Parker, 1 M.S.P.B. at 493.
 
 III. CONCLUSION
 
 61
 For the reasons set forth above, we hold that arbitrator White's decision must be set aside, and the record remanded to him for further proceedings in accordance with this opinion. On remand, the arbitrator must, within sixty days, determine (1) whether the error affected the outcome of the disciplinary proceeding, or (2) whether the collective bargaining agreement between the INS and the Union established the timely notice requirement as one of such importance to the employees that a violation should be considered harmful even in the absence of a showing that the delay affected the outcome of the disciplinary proceeding.[123] This latter determination, of course, must draw its essence from the collective bargaining agreement and, if it does, it will be subject to very limited judicial review.
 
 
 62
 So ordered.
 
 APPENDIX A
 
 63
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 APPENDIX B
 
 64
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 LUMBARD, Senior Circuit Judge, concurring:
 
 65
 I concur in the judgment and join Parts I, II.A, II.C., and III. Concerning Part II.B. regarding the appropriateness of appellate review of the arbitrator's decision, I believe it suffices to note, first, that 5 U.S.C. Sec. 7703(d) (Supp. V 1981) grants us discretion to take review if we are satisfied that the arbitrator "erred in interpreting a civil service law, rule, or regulation affecting personnel management and that the ... decision will have a substantial impact on a civil service law, rule, regulation, or policy directive." Second, this case does not require us to decide the degree of deference we might give to an arbitrator's interpretation of a provision of the collective bargaining agreement or a law, rule, or regulation concerning the grievance process. Rather, the case presents the question whether an arbitrator can fail even to consider the "harmful error" rule of 5 U.S.C. Sec. 7701(c)(2)(A) (Supp. V 1981). A wholesale and unexplained failure to apply procedural rules governing the arbitration process would "manifest an infidelity" to the arbitrator's defining obligations and would justify review. United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Finally, the failure to apply the "harmful error" rule in arbitration proceedings would have a substantial impact on civil service law by strongly promoting forum shopping. Hence, I believe this is an appropriate case to exercise our discretion in favor of taking jurisdiction.
 
 BORK, Circuit Judge, concurring:
 
 66
 As the majority opinion explains, Congress has simultaneously tried to provide federal employees with meaningful collective bargaining opportunities respecting disciplinary procedures and has also tried to limit Merit Systems Protection Board review of agency disciplinary actions by imposing a "harmful error" requirement. Though this case involved the review of an arbitrator's award, it is agreed that the same standards are to be applied by arbitrators and the MSPB. Thus, we have a case in which Congress' intentions as to collective bargaining and use of the harmful error standard conflict. If we hold that the employee must always show harmful error in the sense that his own case is prejudiced, then the procedures arrived at through collective bargaining become meaningless. If, on the other hand, we hold that violation of bargained procedures is itself harmful error, the statutory requirement of harmful error is, if not overridden, at least substantially diminished in importance. Congress has provided no clear guidance as to how to resolve this dilemma. With the law in this unhappy posture, the intermediate result reached by the majority--that violation of a clear provision of the collective bargaining agreement may in some circumstances constitute harmful error--is at least as sensible as the alternatives. Failing further clarification by Congress, I would add only that, in my view, the MSPB, when and if it is confronted with a case where bargained procedures are violated, remains free to adopt its own definition of harmful error. This definition would presumably be subject to judicial review under the customary deferential standard accorded MSPB decisions.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d) (Supp.IV 1980)
 
 
 [1]
 Pub.L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C. (Supp.V 1981)); see 5 U.S.C. Secs. 7121(f), 7703(d) (Supp.V 1981)
 
 
 [2]
 See 5 U.S.C. Sec. 7703(d) (Supp.V 1981); Part II.B. infra
 
 
 [3]
 Arbitrator's Decision 6, reprinted in Joint Appendix ("Jt.App.") 46, 52
 
 
 [4]
 See 31 U.S.C. Sec. 638a(c)(2) (1976); 5 C.F.R. Sec. 735.205 (1982). Section 638a(c)(2) provides, in pertinent part:
 Any officer or employee of the Government who willfully uses or authorizes the use of any Government-owned passenger motor vehicle ... for other than official purposes ... shall be suspended from duty by the head of the department concerned, without compensation, for not less than one month, and shall be suspended for a longer period or summarily removed from office if circumstances warrant.
 
 
 [5]
 Jt.App. 44. See Hoska v. United States Dep't of the Army, 677 F.2d 131, 136-38 (D.C.Cir.1982); 5 U.S.C. Sec. 7513(a) (Supp. V 1981)
 
 
 [6]
 See 5 U.S.C. Sec. 7121(e)(1) (Supp. V 1981); Agreement Between American Federation of Government Employees and Immigration and Naturalization Service, Articles 31-33, reprinted in Brief for Respondent, App. B
 
 
 [7]
 See 31 U.S.C. Sec. 638a(c)(2) (1976)
 
 
 [8]
 Article 31F(3) requires "[t]he Employer ... [to] furnish employees with notices of proposed disciplinary actions at the earliest practicable date after the alleged offense has been committed and made known to the Employer." Brief for Respondent, App. B
 
 
 [9]
 Petition of the United States Office of Personnel Management for Reconsideration of the Arbitrator's Decision, reprinted in Jt.App. 55, 55
 
 
 [10]
 Section 7703(d) is made applicable to arbitral proceedings by 5 U.S.C. Sec. 7121(f) (Supp. V 1981)
 
 
 [11]
 This argument, which the OPM continues to press on this appeal, is meritless. It is true that both the duty to bargain and negotiated agreements in the federal sector are subject to applicable laws, see 5 U.S.C. Secs. 7117(a), 7114(c) (Supp. V 1981), that personnel policies, practices, and matters provided for by federal statute are not negotiable, 5 U.S.C. Sec. 7103(a)(14)(C) (Supp. V 1981), and that an agency cannot bargain away its authority to discipline employees, 5 U.S.C. Sec. 7106(a)(2)(A) (Supp. V 1981). But the CSRA specifically authorizes bargaining concerning the "procedures which management officials of the agency will observe in exercising" their reserved powers, 5 U.S.C. Sec. 7106(b)(2) (Supp. V 1981), and we have held that agencies are not precluded from bargaining over the procedures that they will use in exercising their authority so long as those procedures would not prevent the agency from acting at all, Department of Defense, Army-Air Force Exchange Serv. v. FLRA, 659 F.2d 1140, 1150-58 (D.C.Cir.1981), cert. denied, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982); see American Fed'n of Gov't Employees v. FLRA, 691 F.2d 565, 571-72 (D.C.Cir.1982); National Treasury Employees Union v. FLRA, 691 F.2d 553, 561-63 & n. 76 (D.C.Cir.1982). The collective bargaining agreement's timely discipline requirement was a proper subject of bargaining under this test, and in no sense can the agreement be said to "override" 31 U.S.C. Sec. 638a(c)(2) (1976)
 
 
 [12]
 5 U.S.C. Sec. 7701(c)(1) (Supp. V 1981) establishes two standards of review. Agency actions based on unacceptable performance under 5 U.S.C. Sec. 4303 (Supp. V 1981) need only be supported by "substantial evidence," while all other agency actions must be based on a more convincing "preponderance of the evidence." See S.REP. NO. 969, 95th Cong., 2d Sess. 54-55, reprinted in 1978 U.S.CODE CONG. & AD. NEWS 2723, 2776-77 [hereinafter cited as S.REP. NO. 969]; Parker v. Defense Logistics Agency, 1 M.S.P.B. 489, 499-509 (1980)
 
 
 [13]
 5 U.S.C. Sec. 7701(c)(2)(A) (Supp. V 1981); see Parker v. Defense Logistics Agency, 1 M.S.P.B. 489, 492-96 (1980); S.REP. NO. 969, supra note 12, at 51-52, 64, 1978 U.S. CODE CONG. & AD. NEWS at 2773-74, 2786
 
 
 [14]
 Jt.App. 64
 
 
 [15]
 Jt.App. 67
 
 
 [16]
 See generally Schneider, Public-Sector Labor Legislation--An Evolutionary Analysis, in PUBLIC-SECTOR BARGAINING 191 (B. Aaron, J. Grodin & J. Stern eds. 1979) (summarizing developments in public sector labor legislation). Although important differences persist between the treatment of employees in the private sector and government employees--most notably the prohibition of strikes by public employees, see Professional Air Traffic Controllers Org. v. FLRA, 685 F.2d 547, 550-51 & nn. 1-3 (D.C.Cir.1982) (summarizing federal strike prohibitions); 5 U.S.C. Secs. 3333(a), 7120(f), 7311(3)-(4) (1976 & Supp. V 1981); 18 U.S.C. Sec. 1918 (1976); Note, Statutory and Common Law Considerations in Defining the Tort Liability of Public Employee Unions to Private Citizens for Damages Inflicted by Illegal Strikes, 80 MICH.L.REV. 1271, 1282-86 (1982) (concise summary of policies underlying strike bans)--"the institutional barriers to full implementation of the traditional private sector system," Schneider, supra, at 221, have given way in some important respects, see 5 U.S.C. Sec. 7101(a) (Supp. V 1981)
 
 
 [17]
 Kagel, Grievance Arbitration in the Federal Service: Still Hardly Final and Binding?, in ARBITRATION ISSUES FOR THE 1980 S, PROCEEDINGS OF THE 34 TH ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 178, 179 (J. Stern & B. Dennis eds. 1982). For brief reviews of the history of grievance arbitration in the federal sector, see Smith & Wood, Title VII of the Civil Service Reform Act of 1978: A "Perfect" Order?, 31 HASTINGS L.REV. 855, 856-62 (1980); Comment, Federal Sector Arbitration Under the Civil Service Reform Act of 1978, 17 SAN DIEGO L.REV. 857, 860-63 (1980)
 
 
 [18]
 The "grievances" that are to be resolved under such procedures are defined broadly to include complaints concerning "any matter relating to the employment" of an employee, "the effect or interpretation, or a claim of breach, of a collective bargaining agreement," or "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. Sec. 7103(a)(9) (Supp. V 1981). The parties may, by agreement, reduce the scope of their grievance procedure. 5 U.S.C. Sec. 7121(a)(2) (Supp. V 1981)
 
 
 [19]
 Comment, supra note 17, 17 SAN DIEGO L.REV. at 881. We are concerned in this case with only one of the four types of disputes--a removal, demotion, or suspension under 5 U.S.C. Secs. 4303 or 7512 (Supp. V 1981). See "Appendix A." The other discernible classes of cases that may reach arbitration are (1) "pure grievance" cases, see "Appendix B," which do not involve a reduction in grade or removal for unacceptable performance, a removal or suspension for more than 14 days, a reduction in grade or pay, a furlough of 30 days or less, or a complaint of discrimination; (2) "pure discrimination" cases, which involve an allegation of discrimination that does not also raise a matter appealable to the MSPB; and (3) "mixed" cases, which involve both an allegation of unlawful discrimination and an adverse action under Sec. 7512. See Federal Labor Relations Authority, The Federal Service Labor-Management Relations Statute, Apps. A-D (1979). For a coherent and useful discussion of the procedures governing each type of case, see Comment, supra note 17, 17 SAN DIEGO L.REV. at 880-91. See also Aronin & Kator, Arbitration, Negotiated Grievance Procedures, and Expanded Scope, in LABOR-MANAGEMENT RELATIONS, CIVIL SERVICE REFORMS, AND EEO IN THE FEDERAL SERVICE 58 (A. Burnett, J. Brodsky & B. McGovern eds. 1980); Kagel, supra note 17, at 179-88 (summarizing procedures for each type of case)
 
 
 [20]
 The employee exercises this option upon filing a timely notice of appeal under the statutory procedure or by tendering a timely written grievance under the provisions of the relevant collective bargaining agreement. 5 U.S.C. Sec. 7121(e)(1) (Supp. V 1981)
 
 
 [21]
 H.R.REP. NO. 1717, 95th Cong., 2d Sess. 157, reprinted in 1978 U.S. CODE CONG. & AD. NEWS 2860, 2891 (Conference Report) [hereinafter cited as H.R.REP. NO. 1717]
 
 
 [22]
 See 5 U.S.C. Sec. 7701(c)(1) (Supp. V 1981)
 
 
 [23]
 S.REP. NO. 969, supra note 12, at 111, 1978 U.S. CODE CONG. & AD. NEWS at 2833; see Devine v. Goodstein, 680 F.2d 243, 246 (D.C.Cir.1982) (per curiam)
 
 
 [24]
 See 5 U.S.C. Sec. 7703 (Supp. V 1981)
 
 
 [25]
 See 5 U.S.C. Sec. 7701(c)(2)(A) (Supp. V 1981); Parker v. Defense Logistics Agency, 1 M.S.P.B. 489, 492-96 (1980)
 
 
 [26]
 But see Comment, supra note 17, 17 SAN DIEGO L.REV. at 887-88
 Arbitrators' decisions in cases under Secs. 4303 and 7512 are not subject to review by the Federal Labor Relations Authority. 5 U.S.C. Sec. 7122(a) (Supp. V 1981); 5 C.F.R. Sec. 2425.3(b) (1982). The Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, tit. I, Sec. 127, 96 Stat. 25, 38 (to be codified at 28 U.S.C. Sec. 1295), has vested the new Court of Appeals for the Federal Circuit with exclusive jurisdiction over appeals brought pursuant to 5 U.S.C. Sec. 7703(b)(1) & (d) (Supp. V 1981).
 
 
 [27]
 The limited grounds under which the Director can seek review, moreover, seem substantially unrelated to the standard of review established in Sec. 7703(c). See text at notes 57-58, 106 infra
 
 
 [28]
 S.REP. NO. 969, supra note 12, at 64, 1978 U.S.CODE CONG. & AD. NEWS at 2786
 
 
 [29]
 Id
 
 
 [30]
 See 5 U.S.C. Sec. 7701(e)(1) (Supp. V 1981). The section provides, in part, that a decision of the MSPB is final unless "a party to the appeal or the Director petitions the Board for review within 30 days after the receipt of the decision" or "the Board reopens and reconsiders a case on its own motion."
 
 
 [31]
 See generally Concerned About Trident v. Schlesinger, 400 F.Supp. 454, 478-79 (D.D.C.1975), modified sub nom. Concerned About Trident v. Rumsfeld, 555 F.2d 817 (D.C.Cir.1977); Hoskin v. Resor, 324 F.Supp. 271, 277 (D.D.C.1971) (discussing elements of laches)
 
 
 [32]
 See S.REP. NO. 969, supra note 12, at 9-10, 1978 U.S.CODE CONG. & AD.NEWS at 2731-32; H.R.REP. NO. 1403, 95th Cong., 2d Sess. 7 (1978)
 
 
 [33]
 See S.REP. NO. 969, supra note 12, at 51-52, 55, 62, 1978 U.S.CODE CONG. & AD.NEWS at 2773-74, 2777, 2784
 
 
 [34]
 Id. at 9-10, 62, 1978 U.S.CODE CONG. & AD.NEWS at 2731-32, 2784
 
 
 [35]
 See Part II.B.2. infra. On the need for finality in arbitration, see Abrams, The Integrity of the Arbitral Process, 76 MICH.L.REV. 231 (1977); Meltzer, Ruminations about Ideology, Law, and Labor Arbitration, in THE ARBITRATOR, THE NLRB, AND THE COURTS, PROCEEDINGS OF THE 20TH ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 1 (D. Jones ed. 1967); Robins, The Presidential Address: Threats to Arbitration, in ARBITRATION ISSUES FOR THE 1980S, PROCEEDINGS OF THE 34TH ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 1 (J. Stern & B. Dennis eds. 1982)
 
 
 [36]
 The CSRA provides, for example, no time limits on reconsideration by either an arbitrator or the MSPB
 
 
 [37]
 5 U.S.C. Sec. 7701(e) (Supp. V 1981)
 
 
 [38]
 See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)
 
 
 [39]
 See Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 631-32, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973); Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 488, 68 S.Ct. 174, 177, 92 L.Ed. 88 (1947)
 
 
 [40]
 See Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 461, 12 S.Ct. 511, 512, 513, 36 L.Ed. 226 (1892)
 
 
 [41]
 See Philbrook v. Glodgett, 421 U.S. 707, 713-14, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975)
 
 
 [42]
 In the absence of a congressional indication to the contrary, we generally presume that legislation was not intended to change the common law. See Tarlton v. Saxbe, 507 F.2d 1116, 1122 (D.C.Cir.1974); 2A C. SANDS, STATUTES AND STATUTORY CONSTRUCTION Sec. 45.12 (4th ed. 1973)
 
 
 [43]
 5 U.S.C. Sec. 7701(d)(1) (Supp. V 1981). Section 7701(d)(2) requires that the MSPB "promptly notify the Director whenever the interpretation of any civil service law, rule, or regulation under the jurisdiction of the [OPM] is at issue in any proceeding under this section."
 
 
 [44]
 5 U.S.C. Sec. 7703(d) (Supp. V 1981); S.REP. NO. 969, supra note 12, at 64, 1978 U.S.CODE CONG. & AD.NEWS at 2786
 
 
 [45]
 5 U.S.C. Sec. 7701(d)(1) (Supp. V 1981)
 
 
 [46]
 See text at note 32 supra. One could argue that OPM participation would introduce less delay into the appellate process if the Director took no action until the MSPB had rendered an erroneous decision on the ground that the MSPB will often reach the result desired by the OPM. The nature of the administrative process, however, is such that OPM participation is unlikely substantially to delay MSPB decision making. As a result, petitioning for reconsideration of incorrect decisions is likely to increase the average length of the MSPB appellate process to a greater extent than participation under the circumstances specified in Sec. 7701(d)(1)
 
 
 [47]
 See text at notes 48-51 & 56 infra; see also Burnett, The Role of the Courts and Judicial Review, in LABOR-MANAGEMENT RELATIONS, CIVIL SERVICE REFORMS, AND EEO IN THE FEDERAL SERVICE 327, 347 (A. Burnett, J. Brodsky & B. McGovern eds. 1980) (OPM Director has no right to intervene in grievance arbitration)
 
 
 [48]
 See Abrams, supra note 35, 76 MICH.L.REV. at 236-37; Edwards, Labor Arbitration at the Crossroads: The 'Common Law of the Shop' v. External Law, 32 ARB.J. 65, 92 (1977); 124 CONG.REC. 25,722 (1978), reprinted in HOUSE COMM. ON POST OFFICE AND CIVIL SERVICE, 96 TH CONG., 1ST SESS., 1 LEGISLATIVE HISTORY OF THE CIVIL SERVICE REFORM ACT OF 1978, 814-15 (Comm.Print 1979) (remarks of Rep. Ford in floor debate) [hereinafter cited as LEGISLATIVE HISTORY]
 
 
 [49]
 Shulman, Reason, Contract, and Law in Labor Relations, 68 HARV.L.REV. 999, 1016 (1955); see Feller, The Coming End of Arbitration's Golden Age, in ARBITRATION--1976, PROCEEDINGS OF TGN 29 TH ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 97, 107 (B. Dennis & G. Somers eds. 1976)
 
 
 [50]
 See Alexander v. Gardner-Denver Co., 415 U.S. 36, 50 n. 13, 94 S.Ct. 1011, 1020 n. 13, 39 L.Ed.2d 147 (1974); Aksen, Post-Gardner-Denver Developments in Arbitration Law, in ARBITRATION--1975, PROCEEDINGS OF THE 28 TH ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 24, 26 (B. Dennis & G. Somers eds. 1976)
 
 
 [51]
 See C. UPDEGRAFF, ARBITRATION AND LABOR RELATIONS 21-23 (3d ed. 1970); Fletcher, How Others View Us and Vice Versa: Administrative and Judicial Critiques of the Arbitration Process, in ARBITRATION ISSUES FOR THE 1980 S, PROCEEDINGS OF THE 34 TH ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 218, 228 (J. Stern & B. Dennis eds. 1982); Goldberg, The Mediation of Grievances Under a Collective Bargaining Contract: An Alternative to Arbitration, 77 NW.U.L.REV. 270, 272 (1982); Valtin, The Presidential Address: Judicial Review Revisited--The Search For Accommodation Must Continue, in ARBITRATION--1976, PROCEEDINGS OF THE 29 TH ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 1, 5 (B. Dennis & G. Somers eds. 1976) (decrying third party challenges to arbitral decisions)
 
 
 [52]
 See note 42 supra
 
 
 [53]
 C. UPDEGRAFF, supra note 51, at 282 & n. 19. "The authority and jurisdiction of arbitrators are entirely terminated by the completion and delivery of an award. They have thereafter no power to recall the same, to order a rehearing, to amend, or to 'interpret' in such manner as may be regarded as authoritative." Id. at 116; see Mercury Oil Ref. Co. v. Oil Workers Int'l Union, 187 F.2d 980, 986 (10th Cir.1951) (per curiam); F. ELKOURI & E. ELKOURI, HOW ARBITRATION WORKS 239-41 (3d ed. 1973)
 
 
 [54]
 See C. UPDEGRAFF, supra note 51, at 283. But see UNIF. ARBITRATION ACT Sec. 9, 7 U.L.A. 50 (1978) (adopted in 24 states and the District of Columbia; authorizes modification or clarification of award on application of one party). See generally Dilts, Award Clarification: An Ethical Dilemma?, 33 LAB.L.J. 366 (1982) (discussing discrepancy between Code of Professional Responsibility and Uniform Arbitration Act)
 
 
 [55]
 In addition, "the expense of arbitration under the negotiated grievance procedure may be equally shared by the parties or may be shouldered by the losing party, and there may be no provision for the expenses of a reopening by the Director of OPM who is not a party to the ... agreement." Burnett, supra note 47, at 347
 
 
 [56]
 C. UPDEGRAFF, supra note 51, at 282; see Dilts, supra note 54, at 368
 
 
 [57]
 5 U.S.C. Sec. 7703(d) (Supp. V 1981) (emphasis added)
 
 
 [58]
 S.REP. NO. 969, supra note 12, at 64, 1978 U.S.CODE CONG. & AD.NEWS at 2786. Cf. id. at 57-58, 1978 U.S.CODE CONG. & AD.NEWS at 2779-80 (discussing "substantial impact" standard for discrimination cases) ("Thus, decisions and orders which propel case law in a new direction, or which raise significant conflicts with the policies or interpretations of the [Equal Employment Opportunity] Commission, may be considered by the Commission. [MSPB] actions in individual cases where the significance of the case is limited to its particular facts--so that the decision ... does not have general applicability--should not be considered.")
 
 
 [59]
 NLRB v. Enterprise Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine & General Pipefitters, 429 U.S. 507, 528, 97 S.Ct. 891, 903, 51 L.Ed.2d 1 (1977); see Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 170 (D.C.Cir.1982); Kyle v. ICC, 609 F.2d 540, 542-43 (D.C.Cir.1979) (per curiam)
 
 
 [60]
 S.REP. NO. 969, supra note 12, at 64, 1978 U.S.CODE CONG. & AD.NEWS at 2786; see Devine v. Goodstein, 680 F.2d 243, 246 & n. 16 (D.C.Cir.1982) (per curiam)
 
 
 [61]
 S.REP. NO. 969, supra note 12, at 40, 1978 U.S.CODE CONG. & AD.NEWS at 2762; see Civil Service Reform Act of 1978 and Reorganization Plan No. 2 of 1978, Hearings on S. 2640, S. 2707, and S. 2830 Before the Senate Comm. on Governmental Affairs, 95th Cong., 2d Sess. 276-90 (1978) (Office of Legal Counsel memorandum) [hereinafter cited as Senate Hearings]
 
 
 [62]
 5 U.S.C. Sec. 7703(a) (Supp. V 1981)
 
 
 [63]
 The Office of Legal Counsel suggested, for example, that it might be desirable to foreclose any possibility of review by the Government. Senate Hearings, supra note 61, at 289 n. 29
 
 
 [64]
 Alexander v. Gardner-Denver Co., 415 U.S. 36, 46, 94 S.Ct. 1011, 1018, 39 L.Ed.2d 147 (1974); Abrams, supra note 35, 76 MICH.L.REV. at 231
 
 
 [65]
 United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)
 
 
 [66]
 See, e.g., C. UPDEGRAFF, supra note 51, at 21-23; Edwards, supra note 48, 32 ARB.J. at 92; Fletcher, supra note 51, at 228; Frazier, Labor Arbitration in the Federal Service, 45 GEO.WASH.L.REV. 712, 712 (1977); Rubin, Arbitration: Toward a Rebirth, in TRUTH, LIE DETECTORS, AND OTHER PROBLEMS IN LABOR ARBITRATION, PROCEEDINGS OF THE 31 ST ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 30, 33-36 (J. Stern & B. Dennis eds. 1979)
 
 
 [67]
 Jones & Smith, Management and Labor Appraisals and Criticisms of the Arbitration Process: A Report With Comments, 62 MICH.L.REV. 1115 (1964); see Fletcher, supra note 51, at 228; Edwards, Reflections of a Judge, and Jones, A Meditation on Labor Arbitration and "His Own Brand of Industrial Justice," in PROCEEDINGS OF THE 35 TH ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS (forthcoming)
 
 
 [68]
 See Jones & Smith, supra note 67
 
 
 [69]
 See Abrams, The Power Issue in Public Sector Grievance Arbitration, 67 MINN.L.REV. 261, 280 (1982); Abrams, supra note 35, 76 MICH.L.REV. at 237-38; Goldberg, supra note 51, 77 NW.U.L.REV. at 274-80; Sandver, Blaine & Woyar, Time and Cost Savings Through Expedited Arbitration Procedures, 36 ARB.J., Dec. 1981, at 11, 12
 
 
 [70]
 See, e.g., Rubin, supra note 66, at 34-35
 
 
 [71]
 Id. at 35-36; see Fletcher, supra note 51, at 228
 
 
 [72]
 Meltzer, supra, note 35, at 11-12; see Abrams, supra note 35, 76 MICH.L.REV. at 259-62; Valtin, supra note 51, at 3
 
 
 [73]
 Abrams, supra note 35, 76 MICH.L.REV. at 260 (footnote omitted); see Dunau, Three Problems in Labor Arbitration, 55 VA.L.REV. 427, 427-29 & n. 3 (1969)
 
 
 [74]
 See, e.g., Robins, supra note 35, at 9
 
 
 [75]
 See Meltzer, supra note 35, at 13-14
 
 
 [76]
 See, e.g., Cox, Some Lawyers' Problems in Grievance Arbitration, 40 MINN.L.REV. 41, 42-52 (1955); Note, Judicial Deference to Arbitral Determinations: Continuing Problems of Power and Finality, 23 U.C.L.A.L.REV. 936, 950 (1976)
 
 
 [77]
 See Craver, The Judicial Enforcement of Public Sector Grievance Arbitration, 58 TEX.L.REV. 329, 341-43 (1980); St. Antoine, Judicial Review of Labor Arbitration Awards: A Second Look at Enterprise Wheel and its Progeny, 75 MICH.L.REV. 1137 (1977)
 
 
 [78]
 In making this determination, moreover, any doubts concerning the propriety of an arbitrator's decision must be resolved in favor of the decision. Enterprise Wheel, 363 U.S. at 598, 80 S.Ct. at 1361
 
 
 [79]
 See, Aaron, Judicial Intervention in Labor Arbitration, 20 STAN.L.REV. 41 (1967); Jones, The Name of the Game Is Decision--Some Reflections on "Arbitrability" and "Authority" in Labor Arbitration, 46 TEX.L.REV. 865 (1968); Morris, Twenty Years of Trilogy: A Celebration, in DECISIONAL THINKING OF ARBITRATORS AND JUDGES, PROCEEDINGS OF THE 33 RD ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 331 (J. Stern & B. Dennis eds. 1981)
 
 
 [80]
 See, e.g., Dogherra v. Safeway Stores, Inc., 679 F.2d 1293, 1296-97 (9th Cir.1982); Mobil Oil Corp. v. Independent Oil Workers Union, 679 F.2d 299, 302 (3d Cir.1982); Chicago Cartage Co. v. International Bhd. of Teamsters, 659 F.2d 825, 827 (7th Cir.1981); Bettencourt v. Boston Edison Co., 560 F.2d 1045, 1048-49 (1st Cir.1977). But see Sinicropi, Remedies: Another View of New and Old Problems, in ARBITRATION ISSUES FOR THE 1980 S, PROCEEDINGS OF THE 34 TH ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 134, 134-35 (J. Stern & B. Dennis eds. 1982)
 The grounds for review of arbitrators' decisions have been summarized generally as follows:
 When the arbitrator has demonstrated partiality or has reached conclusions that have no support in the evidentiary record, courts will not uphold the award. Similarly, an award will not be sustained when the arbitrator has deviated grossly from the authority conferred by the bargaining agreement, or has issued an order that is contrary to applicable law or some vital public policy. Nevertheless, a reviewing court's disagreement with an arbitrator's conclusions generally will not preclude enforcement of the arbitral decision as long as that decision does draw its essence from the collective contract and has some support in the evidentiary record. Most private sector parties thus recognize that arbitration awards rarely will be nullified.
 Craver, supra note 77, 58 TEX.L.REV. at 343 (footnotes omitted). See also St. Antoine, supra note 77, 75 MICH.L.REV. at 1150-60 (pointing to lack of arbitral jurisdiction or authority, arbitral modifications of the collective bargaining agreement, procedural unfairness or irregularity, a union's violation of its duty of fair representation, violation of public policy or law, and the availability of independent statutory claims as grounds for nondeference).
 
 
 [81]
 See, e.g., Lodge 2424, Int'l Ass'n of Machinists v. United States, 564 F.2d 66, 71-72 (Ct.Cl.1977) (pre-CSRA decision)
 
 
 [82]
 See Clarke, Substantial Evidence and Labor Arbitration in the Federal Sector, 31 LAB.L.J. 368 (1980); Kagel, supra note 17, at 196
 
 
 [83]
 These justifications are summarized in Note, Arbitration Awards in Federal Sector Public Employment: The Compelling Need Standard of Appellate Review, 1977 B.Y.U.L.REV. 429, 435-37. See generally Aronin, Collective Bargaining in the Federal Service: A Balanced Approach, 44 GEO.WASH.L.REV. 576 (1976) (noting economic distinctions between public and private sectors); Grodin, Political Aspects of Public Sector Interest Arbitration, 64 CALIF.L.REV. 678 (1976) (finality in interest arbitration might afford unions inordinate political leverage on governmental and social policy); Summers, Public Sector Bargaining: Problems of Governmental Decisionmaking, 44 U.CIN.L.REV. 669 (1975) (in public employee bargaining, the fundamental issue to be addressed is how the decisions of government should be made); Wellington & Winter, Structuring Collective Bargaining in Public Employment, 79 YALE L.J. 805 (1970) (wide-ranging treatment starting from premise that full collective bargaining would distort political process)
 
 
 [84]
 See 5 U.S.C. Sec. 7101(a) (Supp. V 1981)
 
 
 [85]
 See, e.g., 5 U.S.C. Sec. 7106(a) (Supp. V 1981)
 
 
 [86]
 See Feller, supra note 49, at 107
 
 
 [87]
 See Burnett, supra note 47, at 344
 
 
 [88]
 See 5 U.S.C. Sec. 7121(a)-(b) (Supp. V 1981)
 
 
 [89]
 Jones, supra note 67; see Kagel, supra note 17, at 178; Morris, supra note 79, at 372-73; St. Antoine, supra note 77, 75 MICH.L.REV. at 1140-42
 
 
 [90]
 Jones, supra note 67; see Morris, supra note 79, at 373
 
 
 [91]
 Although it may be true that grievance arbitration in the federal sector is not a substitute for the right to strike, see Harkless, Comment, in ARBITRATION ISSUES FOR THE 1980 S, PROCEEDINGS OF THE 34 TH ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 206, 209 (J. Stern & B. Dennis eds. 1982), we do not believe that arbitrators' decisions deserve less deference for this reason. Federal employees' "de facto right to strike ... can be as effective, and thus as threatening, as the legalized right to strike of private sector employees," Note, supra note 83, 1977 B.Y.U.L.REV. at 438, and binding arbitration in the federal sector provides, as it does in the private context, "a fair and reasonably expedient alternative to overt economic warfare," id. But see Wellington & Winter, supra note 83, 79 YALE L.J. at 832-33
 
 
 [92]
 See, e.g., St. Antoine, supra note 77, 75 MICH.L.REV. at 1137-38, 1142-44
 
 
 [93]
 See Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960); Comment, supra note 17, 17 SAN DIEGO L.REV. at 869
 
 
 [94]
 F. ELKOURI & E. ELKOURI, LEGAL STATUS OF FEDERAL-SECTOR ARBITRATION 6-7 (1980); see Gamser, Back-Seat Driving Behind the Back-Seat Driver: Arbitration in the Federal Sector, in TRUTH, LIE DETECTORS, AND OTHER PROBLEMS IN LABOR ARBITRATION, PROCEEDINGS OF THE 31 ST ANNUAL MEETING, NATIONAL ACADEMY OF ARBITRATORS 268, 271-72 (J. Stern & B. Dennis eds. 1979); Hayford, The Impact of Law and Regulation Upon the Remedial Authority of Labor Arbitrators in the Federal Sector, 37 ARB.J., Mar. 1982, at 28, 29
 
 
 [95]
 See Burnett, supra note 47, at 343 & n. 32
 
 
 [96]
 These issues may be contrasted with public law issues such as those arising under Title VII of the Civil Rights Act of 1964. See Edwards, supra note 48, 32 ARB.J. at 76-79, 90-91
 
 
 [97]
 See 5 U.S.C. Sec. 7121(a)(2) (Supp. V 1981)
 
 
 [98]
 See St. Antoine, supra note 77, 75 MICH.L.REV. at 1143-44. On the precedential value of arbitral decisions, see text at note 108 infra
 
 
 [99]
 See note 19 supra. See also "Appendix B."
 
 
 [100]
 See 5 U.S.C. Secs. 7122, 7123 (Supp. V 1981)
 
 
 [101]
 5 U.S.C. Sec. 7122(a) (Supp. V 1981)
 
 
 [102]
 Section 7703(c) has generated some confusion. Although the section refers to the setting aside of "agency" action, most courts have applied its standard of review to the decision of the MSPB or the arbitrator rather than to the original agency action. See, e.g., Gipson v. Veterans Admin., 682 F.2d 1004, 1008 (D.C.Cir.1982); Perez v. Army & Air Force Exchange Serv., 680 F.2d 779, 784-85 & n. 17 (D.C.Cir.1982); Snipes v. U.S. Postal Serv., 677 F.2d 375, 376 (4th Cir.1982) (per curiam); Hoska v. United States Dep't of the Army, 677 F.2d 131, 135, 139 (D.C.Cir.1982); McDonough v. United States Postal Serv., 666 F.2d 647, 648, 651 (1st Cir.1981); Brewer v. United States Postal Serv., 647 F.2d 1093, 1096 (Ct.Cl.1981), cert. denied, 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982). One commentator has suggested, however, that "[a]lthough no trial de novo is held at the circuit court level, the court's statutorily required review amounts to that. The court must look at the agency's action, not the regularity or irregularity of the arbitration process or award." Kagel, supra note 17, at 182 (emphasis added). The legislative history is inconclusive, see S.REP. NO. 969, supra note 12, at 63-64, 1978 U.S.CODE CONG. & AD.NEWS at 2785-86, and this latter reading may well be the most natural interpretation of the statutory language. It would, however, defeat Congress' stated purpose of reducing the courts' role in reviewing agencies' decisions to discipline or discharge employees, see text at note 33 supra, and would override several elements of the standard of review governing MSPB and arbitral proceedings, see 5 U.S.C. Sec. 7701(c), including the mandate that only harmful procedural errors provide a basis for reversing agency action
 Congress has recently clarified a similar ambiguity concerning the review of decisions of the General Accounting Office's Personnel Appeals Board, the enabling statute of which is based on the CSRA. Compare 31 U.S.C. Sec. 52-3(l )(2) (Supp. V 1981) ("agency action"), with Pub.L. No. 97-258, Sec. 755, 96 Stat. 877, 902 (1982) ("final decision").
 
 
 [103]
 See 5 U.S.C. Sec. 706 (1976)
 
 
 [104]
 See notes 76-80 supra
 
 
 [105]
 See, e.g., S.REP. NO. 969, supra note 12, at 40, 1978 U.S.CODE CONG. & AD.NEWS at 2762; Senate Hearings, supra note 61, at 287-89 (Office of Legal Counsel memorandum)
 
 
 [106]
 See text at notes 57-58 supra
 
 
 [107]
 See 124 CONG.REC. 25,722 (1978), reprinted in 1 LEGISLATIVE HISTORY, supra note 48, at 814-15 (remarks of Rep. Ford in floor debate); SUBCOMM. ON POSTAL PERSONNEL AND MODERNIZATION OF THE HOUSE COMM. ON POST OFFICE AND CIVIL SERVICE, 96 TH CONG., 1 ST SESS., LEGISLATIVE HISTORY OF THE FEDERAL SERVICE LABOR-MANAGEMENT RELATIONS STATUTE, TITLE VII OF THE CIVIL SERVICE REFORM ACT OF 1978, at 1371-72 (Comm. Print 1979) (Federal Personnel Management Project Option Paper)
 
 
 [108]
 See CODE OF PROFESSIONAL RESPONSIBILITY FOR ARBITRATORS OF LABOR-MANAGEMENT DISPUTES, Rule 2(G); F. ELKOURI & E. ELKOURI, supra note 53, at 365-88; Shulman, supra note 49, 68 HARV.L.REV. at 1020; Smith & Wood, supra note 17, 31 HASTINGS L.J. at 870-71
 
 
 [109]
 Brief for Respondent 19
 
 
 [110]
 Decisions resting on a preponderance of the evidence also cannot stand if they were "based on any prohibited personnel practice described in section 2302(b)" or were "not in accordance with law." 5 U.S.C. Sec. 7701(c)(2)(B)-(C) (Supp. V 1981)
 
 
 [111]
 See H.R.REP. NO. 1717, supra note 21, at 157, 1978 U.S.CODE CONG. & AD.NEWS at 2891
 
 
 [112]
 S.REP. NO. 969, supra note 12, at 111, 1978 U.S.CODE CONG. & AD.NEWS at 2833; see Devine v. Goodstein, 680 F.2d 243, 246 (D.C.Cir.1982) (per curiam)
 
 
 [113]
 It is undisputed that "courts may return an award to the arbitrator for clarification or interpretation where it is ambiguous. However, the mere fact that a court may have power to return an award to an arbitrator for interpretation does not necessarily mean that he may undertake to render an interpretation on his own." F. ELKOURI & E. ELKOURI, supra note 53, at 240 (footnotes omitted)
 
 
 [114]
 Id. at 64, 1978 U.S.CODE CONG. & AD.NEWS at 2786 ("[A]gency actions should be reversed because the agency's procedures were in error only if the procedures followed substantially impaired the rights of the employees."); see Doyle v. Veterans Admin., 667 F.2d 70, 72 (Ct.Cl.1981); Brewer v. United States Postal Serv., 647 F.2d 1093, 1097 (Ct.Cl.1981), cert. denied, 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982)
 
 
 [115]
 The examples provided by the Civil Service Commission of "unimportant procedural matters" were the mistyping of the title of a person's job, Senate Hearings, supra note 61, at 22 (testimony of Alan Campbell), and a failure--subsequently corrected by the agency--to give an employee 30-days' notice of a planned employment action, id. at 43 (testimony of Jules Sugarman)
 
 
 [116]
 S.REP. NO. 969, supra note 12, at 55, 1978 U.S.CODE CONG. & AD.NEWS at 2777
 
 
 [117]
 See, e.g., Doe v. Hampton, 566 F.2d 265, 278 (D.C.Cir.1977); Chrysler Corp. v. FTC, 561 F.2d 357, 362-63 (D.C.Cir.1977)
 
 
 [118]
 Cf. Kotteakos v. United States, 328 U.S. 750, 761, 66 S.Ct. 1239, 1246, 90 L.Ed. 1557 (1946) ("What may be technical for one [judge] is substantial for another; what minor and unimportant in one setting crucial in another."); 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE Sec. 2883 (1973) ("[T]here is reason to doubt whether ... any ... verbal formulation ... can avoid the subjectivity that necessarily inheres in determinations [concerning harmless error].") (footnote omitted)
 
 
 [119]
 See, e.g., Polcover v. Secretary of the Treasury, 477 F.2d 1223, 1232-33 (D.C.Cir.), cert. denied, 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); Heffron v. United States, 405 F.2d 1307, 1311 (Ct.Cl.1969)
 
 
 [120]
 Cf. J. CALAMARI & J. PERILLO, THE LAW OF CONTRACTS Sec. 232 (1970) (discussing liquidated damages); St. Antoine, supra note 77, 75 MICH.L.REV. at 1140-42 (confirmation of parties' agreement is key to judicial deference to arbitral decisions)
 
 
 [121]
 See note 11 supra
 
 
 [122]
 See 5 U.S.C. Sec. 7101(a) (Supp. V 1981). Cf. Giesler v. Department of Transp., 3 M.S.P.B. 367, 368 (1980) (provisions of collective bargaining agreements represent guiding principles and establish nondiscretionary policy under which agencies operate), aff'd, 686 F.2d 844 (10th Cir.1982)
 
 
 [123]
 In this regard, we note that arbitrator White's observation that "[j]ustice delayed is justice denied," Jt.App. 53, is not necessarily an empty platitude in this context, see Gregory & Rooney, Grievance Mediation: A Trend in the Cost-Conscious Eighties, 31 LAB.L.J. 502, 505 (1980), and that arbitrators have in the past recognized the importance of requirements similar to the one at issue here, see, e.g., Department of Transp., FAA, Wiley Post Airport & NAATS, 80 FED.LAB.REL.REP. p 2-2020 (1980); Department of Justice, INS, New Orleans & AFGE, Nat'l Council of INS Locals, 80 FED.LAB.REL.REP. p 2-1954 (1980). But see Department of Defense, Navy, Norfolk Naval Shipyard & MTC, Tidewater Virginia Fed'l Employees, 80 FED.LAB.REL.REP. p 2-1734 (1980)
 
 
 *
 5 U.S.C. Sec. 4303: reduction in grade or removal for unacceptable performance
 5 U.S.C. Sec. 7512: Removal, suspension for more than 14 days, reduction in grade or pay, furlough of 30 days or less.
 
 
 [1]
 Section 4303 and Sec. 7512 matters may, in the discretion of the aggrieved employee, be raised either under the appellate procedures of 5 U.S.C. Sec. 7701 or the negotiated grievance procedure, but not both. An employee shall be deemed to have exercised his option at such time as the employee timely files a notice of appeal or timely files a grievance in writing under the provisions of the grievance procedure, whichever event occurs first. 5 U.S.C. Sec. 7121(e)(1)
 
 
 [2]
 Any collective bargaining agreement may exclude any matter from the application of the grievance procedures. 5 U.S.C. Sec. 7121(a)(2)
 
 
 [3]
 A grievance not satisfactorily settled under the negotiated grievance procedure shall be subject to binding arbitration, which may be invoked by either the exclusive representative or the agency. 5 U.S.C. Sec. 7121(b)(3)(C)
 
 
 [4]
 In hearing Sec. 4303 or Sec. 7512 cases, an arbitrator must apply the same statutorily prescribed standards in deciding the case as would be applied if the matter had been appealed to the MSPB. 5 U.S.C. Sec. 7121(e)(2)
 
 
 [5]
 Judicial review of an arbitrator's award pertaining to Sec. 4303 or Sec. 7512 matters may be obtained in the same manner and on the same basis as if the matter had been decided by the MSPB. 5 U.S.C. Sec. 7121(f)
 
 
 *
 A grievance that does not involve a reduction in grade or removal for unacceptable performance; a removal, suspension for more than 14 days, reduction in grade or pay, or furlough of 30 days or less; or a complaint of discrimination
 
 
 [1]
 A negotiated grievance procedure shall ensure on exclusive representative the right, in its own behalf or on behalf of any employee in the unit, to present and process grievances; and it shall ensure an employee the right to present a grievance on the employee's own behalf, and ensure the exclusive representative the right to be present during the grievance proceeding. 5 U.S.C. Sec. 7121(b)(3)(A) and (B)
 
 
 [2]
 Any collective bargaining agreement may exclude any matter from the application of the grievance procedures. If not excluded, the grievance procedure is the sole procedure available to employees in the unit for resolving pure grievances. 5 U.S.C. Secs. 7121(a)(1)-(2)
 
 
 [3]
 A grievance not satisfactorily settled under the negotiated grievance procedure shall be subject to binding arbitration, which may be invoked by either the exclusive representative or the agency. 5 U.S.C. Sec. 7121(b)(3)(C)
 
 
 [4]
 If upon review of an award the FLRA finds that the award is deficient (1) because it is contrary to any law, rule, or regulation, or (2) on other grounds similar to those applied by federal courts in private sector labor-management relations, then the FLRA may take such action and make such recommendations concerning the award as it considers necessary, consistent with applicable laws, rules, or regulations. 5 U.S.C. Sec. 7122(a)
 
 
 [5]
 Judicial review of a final order of the FLRA involving an arbitrator's award is only obtainable if the order involves an unfair labor practice under 5 U.S.C. Sec. 7118. 5 U.S.C. Sec. 7123(a)